UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| VICKI BONVILLAIN | * | CIVIL ACTION NO. 24-60 |
| | * | |
| VERSUS | * | JUDGE ELDON E. FALLON |
| | * | |
| TERREBONNE PARISH CONSOLIDATED | * | MAGISTRATE JUDGE |
| GOVERNMENT, ET AL. | * | DONNA PHILLIPS CURRAULT |
| | * | |

\*    \*    \*    \*    \*    \*

## ORDER & REASONS

Before the Court are three Motions for Summary Judgment. R. Docs. 87, 97, and 102. Plaintiff opposed all three motions. R. Docs. 111, 112, and 113. Defendants filed reply briefs. R. Docs. 122, 123, and 124. The Court heard oral argument on Wednesday, June 11, 2025. Considering the record, the briefing, the arguments, and the applicable law, the Court now rules as follows.

### I.    BACKGROUND

This case arises out of the death of Jonathon Verdin ("Verdin"), the thirty-one-year-old son of Plaintiff Vicki Bonvillain ("Bonvillain"). R. Doc. 1 at 4. Bonvillain claims that Defendant Michael Leone ("Leone")—a Terrebonne Parish Sheriff's Officer—shot and killed Verdin during a traffic stop on January 8, 2023. *Id.* She further contends that Leone, together with various law enforcement officers and Terrebonne Parish officials, conspired to cover up the murder by reporting instead that her son committed suicide. R. Doc. 1 at 2-4; R. Doc. 29 at 2-4. Bonvillain filed suit against Leone under 42 U.S.C. § 1983, alleging that he violated her son's constitutional right to life by killing him with a use of excessive force. *Id.* at 12. Bonvillain also sued Leone and various law enforcement officers and Terrebonne Parish officials under § 1983 for conspiracy to cover up Leone's wrongdoing. *Id.* at 12-14; R. Doc. 29 at 2-4. Furthermore, she brought a state

1

law claim of municipal liability and vicarious liability against the Terrebonne Parish Consolidated Government as well as other state law claims against the various defendants. R. Doc. 1 at 1, 9, and 17; R. Doc. 29 at 2-3.

During the law enforcement investigation, the officers and officials concluded that Verdin died by two self-inflicted gunshot wounds. Defendant Dr. Yen Van Vo reported Verdin's death as suicide in her autopsy report. R. Doc. 119-20 at 1. The report detailed that both gunshot wounds had seared edges and entered the body from the front and traveled through the decedent's body before exiting his back. *Id.* at 4. Crime scene investigators collected a gun from the floorboard of Verdin's truck as well as two shell casings, one from the chamber of the collected gun and one from the floorboard of Verdin's truck. R. Doc. 119-10 at 16:7-15; *id.* at 20:8-21:22; *id.* at 23:12-24:14. The Louisiana State Police Crime Lab determined that the weapon found on the floorboard of Verdin's truck made the markings on the shell casings found at the scene. R. Doc. 102-11 at 142:6-143:11. Unrefuted testimony establishes that Verdin owned the weapon found on the floorboard of his truck. *See* R. Doc. 102-18 at 16:2-19:21. Based on the evidence, forensic testing, and autopsy report, the investigating agency concluded that Verdin's cause of death was suicide, not homicide.

Bonvillain fundamentally disagrees with the outcome of the investigation. After filing the instant suit, Leone filed a motion to dismiss, which this Court denied pending further discovery. R. Doc. 22.

## II.    PRESENT MOTIONS

Before the Court are three motions for summary judgment. The Court will provide a brief overview of each.

### A.  Leone's Motion for Summary Judgment

Leone moves individually for summary judgment on Plaintiff's § 1983 claims against him. R. Doc. 102. Leone argues that he did not shoot or otherwise fire a weapon at Verdin on the night in question and thus did not violate Verdin's constitutional rights by using excessive force. Rather, he claims that the undisputed evidence shows that Verdin sustained two self-inflicted gunshot wounds.

He argues, in part, that he is entitled to qualified immunity with respect to Bonvillain's § 1983 deprivation of right to life claim on two grounds. First, Leone argues that the uncontested facts demonstrate that Leone did not "seize" Verdin by use of excessive force in violation of the Fourth Amendment. R. Doc. 102-2 at 16-21. More specifically, he contends that because there is no evidence that Leone shot Verdin, there is no clearly established law that provides for a constitutional violation on the facts present here. R. Doc. 102-2 at 21-23. As for Bonvillain's § 1983 conspiracy claim, Leone argues that he also is entitled to qualified immunity because Fifth Circuit case law states that "a conspiracy claim is not actionable without an actual violation of section 1983." *Id.* at 19 (quoting *Hale v. Townley*, 45 F.3d 914, 920 (5th Cir. 1995)). Said differently, Leone argues that Bonvillain's conspiracy claim cannot proceed if her underlying § 1983 excessive force claim cannot proceed. *Id.* at 20.

Bonvillain opposes the motion, arguing that Leone is "an admitted liar" and that "his flight from the scene, inconsistent statements, and failure to render aid raise significant questions about his involvement and credibility." R. Doc. 112 at 1, 5. She also avers that the E3 Electrical, Inc. surveillance footage and Acadian Ambulance footage, both of which recorded the incident, do not conclusively exonerate Leone. *Id.* at 5. Leone replies, arguing that Bonvillain's opposition provides nothing more than conclusory allegations that are unsupported by any material facts.

3

R. Doc. 124.

**B.  Soignet and Guidry's Motion for Summary Judgment**

Sheriff Deputy Guidry and Sheriff Soignet also move for summary judgment on all of Plaintiff's claims. R. Doc. 97. Sheriff Deputy Guidry seems to be the first officer to respond to the scene after Leone's flight. R. Doc. 119-17 at 22:7-22. He is alleged by Bonvillain to have participated in the conspiracy by, among other things, failing to preserve evidence at the scene. R. Doc. 29 at 2. Sheriff Soignet is named in the Complaint insofar as he hired Leone as a deputy sheriff and may have participated in the cover up. R. Doc. 1 at 5.

Soignet and Guidry assert that they are entitled to summary judgment because Bonvillain cannot demonstrate material facts that show that they committed a constitutional violation or violated clearly established law in the course of the investigation. R. Doc. 97-2. Specifically, they aver that Bonvillain has not put forth competent evidence that a constitutional violation occurred, and because a constitutional violation is required for a successful § 1983 conspiracy claim, the conspiracy claims against them must be dismissed. *Id.* at 18-20. They further request that this Court dismiss and/or refer to state court Bonvillain's state law claim of *respondeat superior* against Sheriff Soignet for hiring Leone to be a sheriff deputy. *Id.*

Bonvillain opposes the motion. R. Doc. 111. She argues that Sheriff Soignet is in on the conspiracy because he "personally fired Leone on the basis of an internal affairs investigation file containing reference to the fact that Mr. Verdin died of multiple gunshot wounds." *Id.* at 1. She claims that Sheriff Deputy Guidry conspired to cover up the homicide because "his body camera footage reveals more a pretense at rendering aid than anything substantive" and because Guidry did not log into evidence a bullet that he states he sees in his body camera footage. *Id.* at 2-3. Soignet and Guidry reply, arguing that Bonvillain did not provide any evidence in her opposition

to suggest Soignet and Guidry's involvement in an alleged cover up. R. Doc. 123.

### C. Law Enforcement and Parish Officials' Motion for Summary Judgment

The remaining defendants, former Deputy Coroner and current Coroner Walker, former Coroner Dr. Ledoux, forensic pathologist Dr. Vo, Records Custodian Black, Houma Police Chief Theriot, and former Police Chief Coleman, as well as Terrebonne Parish Consolidated Government ("TPCG") through its current Parish President, Jason Bergeron (collectively referred to as "TPCG Defendants") also move for summary judgment on all of Plaintiff's claims. R. Doc. 87. Their position is that the TPCG Defendants are entitled to qualified immunity because they each acted reasonably and did not violate Verdin's constitutional rights through the course of their investigation, autopsy, and production of documents. R. Doc. 87-1 at 1-2. They next assert that Bonvillain will be unable to prove the elements of municipal liability at trial against TPCG, Bergeron, the Houma Police Chief, or the Parish Coroner. *Id.* at 2. They further argue that the theory of *respondeat superior* against TPCG and/or Bergeron for hiring the defendant-state actors is not an available liability theory under § 1983. *Id.* Finally, they request the Court dismiss any remaining state law claims if the Court dismisses all federal claims. *Id.*

Bonvillain opposes the motion. R. Doc. 113. She argues that the TPCG Defendants conspired together, for example, by losing items of evidence, refusing to conduct certain tests on pieces of evidence, conducting the autopsy quickly and with obvious mistakes, and testifying in depositions that Terrebonne Parish Sheriff's Office employees communicated with Houma Police Department employees. *Id.* at 2-5. Bonvillain did concede that the theory of vicarious liability is not available under § 1983 and admitted that summary judgment should be granted for Jason Bergeron in his capacity as Parish President. *Id.* at 12.

5

### III.    LEGAL STANDARD

#### A.  Summary Judgment Standard

Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must view the evidence in the light most favorable to the nonmovant. *Coleman v. Hous. Indep. Sch. Dist.*, 113 F.3d 528, 533 (5th Cir. 1997). Initially, the movant bears the burden of presenting the basis for the motion; that is, the absence of a genuine issue as to any material fact or facts. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmovant to come forward with specific facts showing there is a genuine dispute for trial. *See* Fed. R. Civ. P. 56(c*); Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). A fact is "material" if its resolution in favor of one party may affect the outcome of the case. *See Saketkoo v. Adm'rs of Tulane Educ. Fund*, 31 F.4th 990, 997 (5th Cir. 2022). "A dispute about a material fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Bodenheimer v. PPG Indus., Inc.*, 5 F.3d 955, 956 (5th Cir. 1993) (citation omitted). "Although we review evidence in the light most favorable to the nonmoving party, we assign greater weight, even at the summary judgment stage, to the facts evident from video recordings taken at the scene." *Caranby v. City of Hous.*, 636 F.3d 183, 187 (5th Cir. 2011) (citing *Scott v. Harris*, 550 U.S. 372 (2007)).

#### B.  Qualified Immunity

"Qualified immunity protects government officials from liability for damages when they violate the law, but nonetheless reasonably could have believed that they were acting lawfully." *Ramirez v. Killian*, 113 F.4th 415, 421 (5th Cir. 2024). On summary judgment, plaintiffs bear the burden of showing that a defendant is not entitled to qualified immunity. *Joseph ex rel. Est. of*

*Joseph v. Bartlett*, 981 F.3d 319, 329 (5th Cir. 2020). To do this, a plaintiff must set forth sufficient evidence showing two things: "(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (internal quotation marks omitted) (internal citations omitted).

On summary judgment, the Court will generally view the facts in a light most favorable to the nonmoving party "unless [their] version [of the facts] is blatantly contradicted by the record, so that no reasonable jury could believe it." *Joseph*, 981 F.3d at 325 (internal quotation marks omitted) (internal citations omitted). "'Conclusory allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation' are all insufficient to overcome immunity." *Orr v. Copeland*, 844 F.3d 484, 490 (5th Cir. 2016) (quoting *Reyes v. Hornbeck Offshore Servs., L.L.C.*, 383 F. App'x. 442, 443-44 (5th Cir. 2010)).

## IV.    LAW AND ANALYSIS

The parties dispute whether genuine issues of material facts exist to show that: (1) Leone violated Verdin's constitutional rights; (2) Leone, Soignet, Guidry, and the TPCG Defendants conspired to cover up a homicide; and (3) TPCG should be held liable under *Monell*. Defendants request that the Court dismiss any remaining state law claims if it grants summary judgment on all the federal claims. The Court will take each issue in turn.

### A. Constitutional Violation—Plaintiff Has No Evidence That Leone Used Excessive Force by Shooting Verdin.

First, the Court will address Bonvillain's § 1983 claim against Leone for deprivation of her son's right to life, properly assessed as a Fourth Amendment excessive force claim. Defendants assert that they have submitted material, undisputed facts to show that Leone did not cause the injuries to Bonvillain's son. Their position is that Leone did not use excessive force on Verdin because Leone did not fire the gun that killed Verdin. If Leone did not violate Verdin's

7

constitutional rights by use of excessive force, then Bonvillain not only fails to meet the constitutional injury element of her Fourth Amendment excessive force claim—she also fails to meet the constitutional injury element of her conspiracy claim. Furthermore, for Bonvillain to overcome Defendants' qualified immunity defense, she would need to put forth competent summary judgment evidence that could cause a reasonable factfinder to conclude that Leone shot Verdin. *E.g.*, *Bodenheimer*, 5 F.3d at 956.

Starting with the first prong of the qualified immunity analysis, the Court must consider whether Leone's actions at the scene violated Verdin's Fourth Amendment rights. "To establish a claim of excessive force under the Fourth Amendment, plaintiffs must demonstrate: '(1) injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable.'" *Trammell v. Fruge*, 868 F.3d 332, 340 (5th Cir. 2017) (quoting *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009)). This fact-intensive inquiry depends on the "circumstances of each particular case." *Deville*, 567 F.3d at 167 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

There is no dispute that Verdin suffered an injury. The outcome in this case will hinge on whether Plaintiff has put forth sufficient material facts such that a reasonable jury could conclude that the two gunshot wounds her son suffered were the direct result of a use of force by Leone. Defendants assert that they have submitted material, undisputed facts to show that Leone did not shoot Verdin. If their assertion is correct, Bonvillain would not meet the causation element of her excessive force claim. After reviewing the summary judgment evidence in this matter, the Court finds that Bonvillain has not put forth any material facts to dispute Defendants' summary judgment evidence on the element of causation for the following reasons.

i.      The Weapon That Caused Verdin's Injury

Defendants have submitted unrefuted forensic evidence that it was Verdin's gun, not either of Leone's, that was fired on the night in question. Undisputed testimony shows that a 9-millimeter FN Model 509 semiautomatic pistol was in Verdin's possession before January 8, 2023. *See* R. Doc. 102-2 at 18. Verdin's coworker testified that the gun was won in a raffle, and that he brought it to Verdin before January 8, 2023. R. Doc. 102-18 at 16:2-19:21. Plaintiffs do not offer any testimony or evidence to refute this witness's claim. Thus, the only reasonable determination is that this F-9 509 pistol was Verdin's.

No bullet holes were found in the exterior of Verdin's truck. R. Doc. 119-10 at 89:18-90:2. Inside the truck, investigators found a F-9 509 pistol on the front driver's side floorboard. R. Doc. 119-10 at 16:7-15. Investigators later collected two firearms from Leone, a 9-millimeter Smith and Wesson Model M&P9 M2.0 semiautomatic pistol,[1] and a Glock .22 caliber pistol.[2] *Id.* at 25:3-19. Investigators also recovered from the scene two used bullet casings, one on the front driver's side floorboard of Verdin's truck and one in the chamber of Verdin's F-9 509 pistol found on the floorboard of his truck. *Id.* at 20:8-21:22, 23:12-24:14. A crime lab conducted a direct comparison of the three pistols and two casings. *Id.* at 31:7-21.

A firearms analyst tested the three firearms for functionality and to compare the shell casings the lab fired with the two casings from the scene. R. Doc. 102-11 at 142:6-143:11. Based on her test firing, the analyst determined that Verdin's gun, the F-9 509 pistol, fired the two shell

---

[1]      Leone's unrefuted testimony states that this was his duty weapon, and during the incident, it was holstered in his duty belt on the passenger side floorboard of his vehicle. R. Doc. 118-1 at 37:5-25.

[2]      Leone testified that his personal weapon was a Glock .40 that he had in a holster on his right side during his encounter with Verdin. Id. at 38:4-39:7; 83:1-3. The Court notes that the firearms examiner testified that she analyzed a Glock .22, not a Glock .40. R. Doc. 102-11 at 142:14-16. However, an investigator testified that one of the weapons she collected from Leone and sent to the Louisiana State Police Crime Lab was a "40 S&W caliber Glock Model 22Gen4 semi-automatic pistol." R. Doc. 119-10 at 12-10. As this could explain the difference in testimony, this discrepancy is irrelevant, because the firearms examiner found that Verdin's gun made the marks on the two used shell casings recovered by investigators.

casings found in Verdin's truck. *Id.* at 143:7-11. Plaintiff has not put forth evidence to refute this determination. Thus, the Court cannot find any material facts to dispute that it was Verdin's gun, not either of Leone's, that fired the two fatal shots on the night in question.

The Court will next assess whether Bonvillain has presented material facts to support an inference that law enforcement officers and/or investigators planted the gun and/or the shell casings in Verdin's truck in furtherance of a cover up. Plaintiff highlighted that after Verdin was taken away by an Acadian Ambulance, Sheriff Deputy Guidry's body camera footage records him saying that "they don't have a shell casing in there" to his colleagues, referencing the inside of Verdin's truck. R. Doc. 111 at 3. To Plaintiff, this statement should give rise to a material fact about whether the shell casing was planted. The Court finds, however, that this statement, when taken in context with the rest of the evidence and Guidry's body camera footage, is insufficient to give rise to a fact question about whether a shell casing was on the floorboard of Verdin's truck.

The crime scene investigator testified that she recovered a shell casing from the floorboard of Verdin's truck a few hours after the incident when the truck was removed from the scene and taken to the Houma Police Department. R. Doc. 119-10 at 19:9-21:22. However, Guidry testified that his statement on the body camera footage was accurate, and that he did not see a shell casing in Verdin's truck when he was at the scene. R. Doc. 115-7 at 41:1-15. He also stated that he "didn't go into depth into the vehicle" looking for evidence. *Id.* at 41:9-11. Specifically, Guidry testified that he did not focus on evidence at the scene both because "crime scene preservation comes completely behind preservation of life" and because he was "not a crime scene detective, and it[] [wasn't his] case." R. Doc. 115-7 at 27:4-10.

Further, a review of the body camera footage reveals that Guidry made this statement to a handful of colleagues who thereafter continued to speculate about the on-scene evidence and how

the incident transpired. After Guidry makes the statement referenced by Plaintiff, another voice in the video speculates that the shell casing was "probably all the way in" Verdin's truck. R. Doc. 100 at 11:16-11:19 (thumb drive containing Exhibit AA to R. Doc. 97). These speculative statements by on-scene officers who are not members of the investigating law enforcement agency, without more, cannot create a factual dispute here.

Importantly, Guidry's statement does not create a factual dispute about two other important investigative findings—the other shell casing in the chamber of Verdin's gun, and the presence of Verdin's gun on the floorboard of his truck when Guidry arrived on the scene. Unrefuted testimony by the investigator states that she found a used shell casing in the chamber of the gun found on the scene. *Id.* at 23:12-24:14. Thus, for Plaintiff's theory to work, both shell casings would have had to be placed on the scene, one on the floorboard and the other in the chamber of Verdin's gun. Plaintiff has not presented evidence to support a finding that the used shell casing was placed in the chamber of Verdin's gun.

The rest of Guidry's body camera footage also works against Plaintiff's theory of planted evidence because it shows the gun on the floorboard of Verdin's truck when Guidry arrives on scene. *See* R. Doc. 100. Guidry notably begins recording when he is still driving his patrol car, so the viewer can see Guidry's entire interaction with Verdin. It appears that Guidry is the first officer on the scene, and upon his initial approach to Verdin's open driver's side door, the footage shows a gun lying next to Verdin's right foot on the front driver's side floorboard. *Id.* at 00:43. Guidry testified to seeing the firearm on the floorboard. R. Doc. 115-7 at 26:15-22. Bonvillain has not presented any evidence that could give rise to the inference that the gun was planted on the floorboard before Guidry arrived on the scene, nor has Bonvillain presented any evidence that the gun depicted in the video is not Verdin's.

Guidry's failure to notice the shell casing on the floorboard of the truck could be due to his desire to preserve Verdin's life. It could also be due to Guidry's knowledge that the scene was not his to investigate. Regardless, it is irrelevant because it does not strike at the heart of Plaintiff's primary claim—that Leone shot Verdin. Guidry's statement does not assist the factfinder in determining which gun fired the shots that night, nor does it support the idea that Leone fired the gun. Put simply, an officer's failure to notice a shell casing in the course of an active life-saving incident does not give rise to an inference that he conspired to cover up a homicide.

Altogether, the unrefuted forensic evidence does not support a finding that Leone shot Verdin. Verdin's gun was found on the floorboard of his truck by investigators and was shown to be on the floorboard in the first moments of Guidry's body camera footage. Investigators found one used shell casing in the chamber of Verdin's gun and one on the floorboard of Verdin's truck. Forensic testing revealed that Verdin's gun, not either of Leone's, made the markings on the two shell casings. Bonvillain has not presented competing forensic testing, nor has she put forth material facts to support that the gun or either of the two shell casings were planted at the scene. Thus, the only reasonable conclusion is that Verdin's gun fired the shots that killed him, and that law enforcement officers did not plant the gun and shell casings at the scene.

### ii.    Autopsy Evidence

Defendants have submitted unrefuted evidence that the autopsy conducted by Dr. Vo, a forensic pathologist associated with the Terrebonne Parish Coroner's Office, found that Verdin suffered two gunshot wounds that had features consistent with self-inflicted gunshot wounds. The Court notes that the autopsy reported Verdin's blood alcohol level as .251%, which is over three times the legal limit. *Id.* at 2, 8-10. It also detailed the trajectory of both bullets as "front-to-back" and described the wounds on Verdin's back as "exit gunshot wound[s]." R. Doc. 119-20 at 4. As

the Court will discuss later, undisputed video evidence shows that Leone does not get in front of Verdin at any point during the encounter, except for when he flees the scene in his police car. *See* R. Doc. 104 (thumb drive containing Exhibits N-1 and N-2 to R. Doc. 102).

The report also stated that both gunshot wounds on the front of Verdin's body had seared edges. R. Doc. 119-20 at 4. Dr. Vo testified that searing is a characteristic most consistent with close-range gunshot wounds. R. Doc. 119-21 at 63:2-7. There is no evidence that Leone was ever in close proximity to Verdin. In fact, there is undisputed video evidence that Leone remained in or adjacent to his car, which was several car lengths behind Verdin's truck, during the course of the encounter. The undisputed video evidence also shows that Verdin remained in his truck for the entire encounter. *See* R. Doc. 104 (thumb drive containing Exhibits N-1 and N-2 to R. Doc. 102).

Dr. Vo also testified that she found not only seared edges around both gunshot wounds, but no presence of stippling or unburned or burned gunpowder particles. R. Doc. 119-21 at 26:22-3. Dr. Vo explained that stippling is a feature consistent with intermediate-range gunshot wounds, and it is a finding on the surface of the skin that occurs when gunpowder flakes, either burnt, unburned, or partially burned, either become embedded with or scrape the surface of the skin surrounding the gunshot wound. *Id.* at 29:9-17; *id.* at 62:12-19. Dr. Vo also testified that in her experience, she expects to see unburned or burned gunpowder particles on the skin surrounding wounds in an intermediate range wound moreso than a close-range wound. *Id.* at 33:21-34:4.

Bonvillain attempts to refute Dr. Vo's autopsy report with her own expert report. The Court finds that Plaintiff's expert report does not refute any of the autopsy's forensic findings. Indeed, Bonvillain's expert testified that he is not a forensic pathologist. *E.g.*, R. Doc. 107-4 at 146:19-22. When asked if it's true that "[he] know[s] very little about the six common physical characteristics of an entrance wound that is commonly known in the forensic pathologist world" he answered,

"[t]hat's correct." R. Doc. 107-4 at 141:7-11. Defendants argue that Plaintiff's expert does not have sound credentials to be considered an expert in forensic pathology in this case. The Court needs not address this because the Court finds that it would come to the same determination even if it accepted Bonvillain's expert.

Bonvillain's expert report claims that Verdin's wounds are not self-inflicted because of the statistical improbability of a multiple gunshot wound suicide, arguing that the rarity creates a presumption that Verdin did not shoot himself. R. Doc. 113 at 3. The report states that "it is accepted that 3 to 5% only of suicides are due to multiple gunshots. This leaves a 95% chance that Mr. Verdin's death was not caused by suicide and therefore the only alternative is that the death is a homicide." R. Doc. 101-3 at 2. While the Court takes into consideration the statistical rarity of multiple-gunshot self-harm situations, statistics alone do not refute the autopsy's forensic findings. Moreover, whether Verdin's wounds are self-inflicted has no bearing on the critical issue— whether Leone shot Verdin. Bonvillain's expert does not address this.

Bonvillain's expert opines on forensic evidence as well. He reported that a "lack of gunpowder burns or gunpowder residue . . . at the entry wounds [] would have been present if the gun were fired at such a close distance." *Id.* But in Bonvillain's expert's deposition, he conceded that the crime lab "didn't test" for gunpowder residue at the entry wound. R. Doc. 107-4 at 229:7-230:5. Furthermore, the "lack of gunpowder burns or gunpowder residue" assertion does not directly address or refute Dr. Vo's finding of a lack of stippling and unburned or burned gunpowder particles on Verdin. R. Doc. 119-20. Whereas Dr. Vo explained that stippling and unburned or burned gunpowder particles are more consistent with intermediate range, not contact range, gunshot wounds, Bonvillain's expert does not opine on the differences between close-range and intermediate-range gunshot wounds. *See* R. Doc. 119-21 at 33:21-34:4.

14

Bonvillain's expert report also does not address a few other key findings in Dr. Vo's autopsy report that supports her determination that Verdin died by close-range gunshot wounds. The expert report does not address Dr. Vo's findings that both gunshot wounds had seared edges, whereas Dr. Vo testified that seared edges are indicative of close-range gunshot wounds. R. Doc. 119-21 at 62:12-19. Similarly, Plaintiff's expert report does not refute Dr. Vo's finding that the bullet entered the front of Verdin's body and traveled through to the back. The unrefuted finding of the bullet's trajectory is significant since the surveillance footage shows that Leone never stood in front of, or came close to, Verdin.

In short, the threadbare and conclusory assertions in Plaintiff's expert report, without more, cannot serve to refute the material facts derived from Dr. Vo's autopsy report. Considering the unrefuted forensic evidence and Plaintiff's expert report, the Court cannot find material facts to dispute the autopsy's finding that Verdin's wounds were a result of close-range gunshots. There is no evidence that Leone was ever in close proximity to Verdin, so the only reasonable conclusion is that Leone could not have inflicted those close-range gunshot wounds. But overall, the unrefuted autopsy evidence and expert report are irrelevant because they do not prove that Leone—or any officer—shot Verdin.

### iii.    Evidence of the Incident

Finally, the Court will assess the surveillance footage and whether it establishes evidence that tends to refute Plaintiff's allegations that Leone shot the gun that killed Verdin. *See Caranby*, 636 F.3d at 187 ("Although we review evidence in the light most favorable to the nonmoving party, we assign greater weight, even at the summary judgment stage, to the facts evident from video recordings taken at the scene.").

The surveillance footage taken from E3 Electrical, Inc. shows that (1) a red truck (Verdin's)

turns onto a one-way street going the wrong way, (2) a Terrebonne Parish Sheriff's Office vehicle (driven by Leone) turns onto the street behind the truck with its blue lights on, (3) both of the vehicle's driver's side doors open, (4) a man (Leone) gets out of the Sheriff's Office vehicle and stands behind his door, (5) the camera angle does not show anyone getting in or out of the red truck, and (6) as an Acadian Ambulance drives by, the man that got out of the Sheriff's Office vehicle looked behind himself, got back into his vehicle, and drove off down the road the wrong way, passing the red truck. R. Doc. 104 (thumb drive containing Exhibit N-2 to R. Doc. 102). After the Sheriff's Office vehicle leaves the frame of the video, there are forty-four seconds of footage where the camera angle does not show anyone approaching or getting in or out of the red truck. *Id.*

Plaintiff does not put forth any evidence to refute the facts established by the video footage. Instead, Plaintiff proffers that it is suspicious that Leone fled the scene of her son's death. R. Doc. 112 at 1-2. She highlights that Leone concealed his involvement in the traffic stop from his initial reports to dispatch and to officers and investigators at the scene. *Id.* at 2. She also argues that Leone's "lies are motivated by a much more serious concern than staying out of trouble on his job[,]" implying that Leone's excuse for why he lied about fleeing the scene is pretext. *Id.* But these arguments, without more, are the kind of "'[c]onclusory allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation' [that] are all insufficient to overcome [qualified] immunity." *Orr*, 844 F.3d at 490 (quoting *Reyes*, 383 F. App'x. at 443-44).

Plaintiff does not produce any evidence or testimony to show that Leone approached Verdin's vehicle at any time, which, if shown, could support an inference that Leone came into possession of Verdin's gun sometime at the scene. *See* R. Doc. 104 (thumb drive containing

Exhibit N-1 and N-2 to R. Doc. 102). Similarly, Plaintiffs have not put forward evidence that Leone and Verdin had an encounter prior to or between the first and second time Leone saw Verdin driving the incorrect way down two different one-way streets. *See* R. Doc. 118-1 at 60:18-63:5. Thus, there is no evidence that Leone could have come into possession of the gun that shot Verdin prior to their encounter.

Next, and as previously mentioned, the E3 Electrical, Inc. surveillance footage depicts an Acadian Ambulance driving by at the time Leone exits his vehicle. *Id.* (containing Exhibit O to R. Doc. 102); *see also* R. Doc. 100 (thumb drive containing Exhibit CC and DD to R. Doc. 97). The ambulance recorded its drive-by encounter of the incident through dash camera and intra-cab camera video recordings. R. Doc. 100 (thumb drive containing Exhibit CC and DD to R. Doc. 97). While this footage is somewhat unclear, it does show the two Acadian Ambulance EMTs drive by the incident. EMT Serigny, who was driving, testified that she saw Leone get out of his car but did not see a weapon on him or in his hand. R. Doc. 102-8 at 16:13-17:1; 24:6-18. EMT McPherson also testified that she was in and out of sleep in the passenger seat but remembered seeing the officer get out of the driver's side of his car which was behind Verdin's vehicle. R. Doc. 102-9 at 13:6-17. She further stated she did not see anyone outside of Verdin's truck when she heard the shot.[3] *Id.* at 14:13-17. Again, Plaintiff has not produced any evidence to refute this testimony, which is corroborated by the surveillance footage.

The Court finds that the unrefuted surveillance footage, which is both corroborated by other evidence and consistent with the testimony of numerous fact witnesses, does not show Leone

---

[3]     The Court notes that the EMT consistently references a single "shot" in her deposition testimony. *E.g.*, R. Doc. 102-9 at 13:18-25; *id.* at 14:13-15:11; *id.* at 29:5-15. However, whether the EMT heard one shot is immaterial to the central question of whether Leone shot Verdin because the EMT's testimony does not create a material fact dispute in light of the autopsy's forensic finding that Verdin suffered two gunshot wounds, nor the crime scene investigator's finding of two shell casings at the scene.

approach Verdin's truck. Thus, the Court cannot find any material facts to show that Leone could have come into possession of the gun that killed Verdin at the scene or before the incident.

### iv.    Conclusion

Plaintiff has failed to produce any evidence that could give rise to the inference that Leone fired the two shots from Verdin's gun that killed him. Bonvillain has not refuted the evidence that Verdin's gun created the markings on the shell casings found at the scene, nor the autopsy's findings of sear marks around the two gunshot wounds, nor the travel pattern of the gunshot wounds from the front of Verdin's body through the back. Furthermore, because the gunshot wounds traveled from front to back, Leone would have had to stand in front of Verdin to fire the two shots. While the surveillance footage may not show who fired the fatal bullets, it clearly shows that Leone never walked around the driver's side door of his vehicle to approach Verdin, let alone stood in front of Verdin, before he drove off.

The Court notes that there may be some factual disputes about certain aspects of the autopsy and on-scene actions of Leone, but these factual disputes are not material to the excessive force claim. Plaintiff alleges that it is suspicious that the autopsy erroneously reported (1) Verdin as circumcised when he was not, (2) that the autopsy occurred at 8:30 a.m. when it occurred at 11:30 a.m., and (3) Verdin's ethnicity as Caucasian rather than Native American. R. Doc. 113 at 4. But these aspects of Dr. Vo's autopsy are not material to the characteristics of Verdin's gunshot wounds. Plaintiff also finds it suspicious that Leone fled the scene and initially lied to officers. R. Doc. 112 at 1-2. But these points are also not material to whether Leone took possession of and fired Verdin's gun twice.

The Court is hesitant to accept that Verdin's cause of death was "suicide." It may have been accidental when he, in his inebriated state, tried to hide the weapon during the traffic stop

and it unexpectedly fired. In any event, the Court finds that there are no material facts that could allow a reasonable juror to find that Leone got so close to Verdin that he could have fired two close-range gunshots. Nor are there material facts that could support a finding that Leone stood in front of Verdin to fire the front-to-back gunshots.

It is Bonvillain's burden on summary judgment to show that her son suffered a constitutional injury of a clearly established right. *See al-Kidd*, 563 U.S. at 735. To do this, she needed to provide evidence of genuine issues of material fact that Leone used excessive force when conducting the improper traffic stop on her son. Bonvillain has failed to show that her son's injury "resulted directly and only from a use of force that was clearly excessive." *Trammel*, 868 F.3d at 340 (quoting *Deville*, 567 F.3d at 167). Based on this finding, the Court need not analyze whether Plaintiff has met the third element of a Fourth Amendment excessive force claim. Plaintiff has failed to establish a § 1983 claim.

## B. There Can Be No Conspiracy Claim If There Is No Evidence of a Constitutional Violation.

In the Fifth Circuit, to bring a successful § 1983 conspiracy claim, a plaintiff must "'allege the existence of (1) an agreement to do an illegal act and (2) an actual constitutional deprivation.'" *Bevill v. Fletcher*, 26 F.4th 270, 274-75 (5th Cir. 2022) (quoting *Whisenant v. City of Haltom*, 106 F. App'x 915, 917 (5th Cir. 2004) (per curiam)). "If qualified immunity bars [the plaintiff's underlying constitutional] claim, 'there [is] no need to reach the issue of whether a conspiracy existed to engage in those actions." *Id.* (citing *Hale v. Townley*, 45 F.3d 914, 921 (5th Cir. 1995)). Said otherwise, "[n]o deprivation, no § 1983 conspiracy." *Shaw v. Villanueva*, 918 F.3d 414, 419 (5th Cir. 2019).

Since this Court finds that Bonvillain has not produced sufficient evidence that Leone used excessive force against Verdin in violation of his constitutional rights, the Court concludes that

Bonvillain cannot prove the constitutional-injury element of her conspiracy claim. If there are no genuinely disputed material facts that could show that Leone violated Verdin's constitutional rights, then there would be no need for a conspiracy to cover up a homicide. *Cf. Ryland v. Shapiro*, 708 F.2d 967, 974-75 (5th Cir. 1983) (allowing a § 1983 conspiracy claim to survive dismissal when a complaint alleged that defendants successfully covered up a murder for eleven months, which allegedly obstructed justice and/or deprived the plaintiffs of constitutional rights). Here, Bonvillain cannot assert a cognizable constitutional injury to her son or herself if there are no facts to support that her son's death was a homicide committed by Leone.

Defendants are entitled to qualified immunity on Bonvillain's conspiracy claims because she cannot prove an underlying constitutional injury. As Bonvillain asserts a handful of alternative constitutional injuries, the Court will briefly address them.

### i.    There Are No Alternative Constitutional Injuries Available to Bonvillain.

Bonvillain argues that an alternative constitutional injury could be a Fourteenth Amendment deprivation of her right to associate with her adult son. R. Doc. 112 at 6. However, this constitutional injury to Bonvillain inherently requires her son to have been killed by Leone or another Terrebonne Parish Sheriff's Office or Houma Police Department officer, and there is no evidence to support this. Further, "neither the Supreme Court nor the Fifth Circuit has held that [a putative constitutional right to parental association with an adult child] exists." *Douglas v. DePhillips*, No. 17-2305, 2017 WL 4574422, at *6 (E.D. La. Oct. 13, 2017), *aff'd*, 740 F. App'x 403, 405-06 (5th Cir. 2017). Thus, this constitutional theory cannot serve as the basis for her conspiracy claim.

Moreover, Bonvillain cannot proceed under any other Fourteenth Amendment substantive due process theory. The Supreme Court has stated that it is reluctant to expand the scope of

substantive due process, and that "'[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims.'" *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 842 (1998) (quoting *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (plurality)). With this guidance in mind, the Court finds that the Fourth Amendment, not the Fourteenth Amendment, provides the proper textual source for the claims at hand. Since Bonvillain has not alleged sufficient facts in support of her theory that Leone fired the gun that fatally injured Verdin, she has not alleged sufficient facts in support of a Fourth Amendment constitutional injury that could underpin her conspiracy claim.

Bonvillain argues alternatively that procedural due process may operate here. R. Doc. 111 at 4. But this reliance is also misplaced. Bonvillain cites two cases that this Court has reviewed and finds to be inapposite to the matter at hand. One case involved allegations that defendant-officers deprived plaintiff of his constitutional rights during the course of a criminal investigation, but the present § 1983 case is not based on violations during the course of a criminal investigation into either Bonvillain or her son.[4] The other case, which has since been overturned, involved a § 1983 claim for malicious prosecution.[5] But the present case is not a § 1983 claim for malicious

---

[4]     Bonvillain cited *Villegas v. City of El Paso*, No. 15-386, 2020 WL 981878 (W.D. Tex. Feb. 28, 2020) in support of her contention that the Due Process Clause of the Fourteenth Amendment could operate here. R. Doc. 113 at 11. In that case, the plaintiff alleged that defendant-officers deprived him of his constitutional rights throughout a criminal investigation. *Villegas v. City of El Paso*, No. 15-386, 2020 WL 981878, at *2-3 (W.D. Tex. Feb. 28, 2020) (internal citations omitted). The court explained that "[k]nowingly fabricating evidence . . . and obtaining a conviction with testimony that government agents know is false, and suppression of exculpatory evidence by police officers all amount to denial of a fair trial and violate the Fourteenth Amendment right to due process and are actionable under Section 1983." *Villegas v. City of El Paso*, No. 15-386, 2020 WL 981878, at *8 (W.D. Tex. Feb. 28, 2020) (internal citations omitted).

[5]     Bonvillain cited *Castellano v. Fragozo*, 352 F.3d 939 (5th Cir. 2003) (en banc) as standing for the proposition that "the manufacturing of evidence and knowing use of that evidence, along with perjured testimony, violated the plaintiff's Fourteenth Amendment due process rights." R. Doc. 113 at 11. That case, which has since been overturned, held that malicious prosecution claims cannot serve as a standalone constitutional violation in § 1983 claims. *Castellano v. Fragozo*, 352 F.3d 939, 942 (5th Cir. 2003) (en banc); *see also Espinal v. City of Hous.*, 96 F.4th 741, 748 (5th Cir. 2024) (explaining that *Castellano* has been overruled by *Thompson v. Clark*, 596 U.S. 36, 42 (2022) as acknowledged in *Armstrong v. Ashley*, 60 F.4th 262, 278 (5th Cir. 2023)).

prosecution, so its procedural due process arguments do not apply here.

The Court thus finds that Bonvillain has not demonstrated another constitutional injury that could apply to the facts here. Defendants are not liable to Bonvillain on her § 1983 conspiracy claims due to a lack of material facts relevant to a cognizable constitutional injury.

### C. Plaintiff Cannot Prove a *Monell* Claim.

TPCG Defendants argue that Bonvillain will not be able to prove a § 1983 municipal liability case against the Terrebonne Parish Consolidated Government through its Parish President Jason Bergeron because her complaint only alleges that the TPCG "is the employer of Defendants CORONER, POLICE CHIEF, COLEMAN, and CUSTODIAN and the party responsible for payment of damages caused by them in their official capacities." R. Doc. 87-1 at 40; R. Doc. 1 at 8-9. There are two steps involved in bringing a successful § 1983 claim against a municipality like the TPCG. First, the plaintiff must show that the employees in question actually violated the plaintiff's constitutional rights. *See Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658 (1978). Second, the plaintiff must show that a specific "policy or custom" enacted by the municipality itself was the "moving force" of the particular constitutional violation. *Id.* That is, "the unconstitutional conduct must be directly attributable to the municipality through some sort of official action or imprimatur." *Piotrowski v. City of Hous.*, 237 F.3d 567, 578 (5th Cir. 2001).

TPCG Defendants briefly assert that Bonvillain has not established the *Monell* elements. R. Doc. 87-1 at 40. Namely, they argue that Bonvillain has not plead facts to support that "an official policy promulgated by a municipal policymaker was the moving force behind the violation of a constitutional right." *Henderson v. Harris Cnty., Tex.*, 51 F.4th 125, 130 (5th Cir. 2022). In opposition, Bonvillain does not argue any of the *Monell* elements. *See* R. Doc. 113. Instead, she concedes that § 1983 does not provide a cause of action for vicarious liability and states that

"[s]ummary judgment dismissing claims against Jason Bergeron in his capacity as Terrebonne Parish President is admitted." *Id.* at 12.

In any event, the *Monell* elements require the plaintiff to prove a constitutional injury, and Bonvillain has not done that here. The Court will thus dismiss any claims pending against Bergeron and TPCG, as well as Bonvillain's claims of municipal liability against TPCG and other named government officials.

### D. Plaintiff's State Law Claims Will Be Dismissed So They Can Proceed in State Court.

Federal district courts are empowered to exercise supplemental jurisdiction over "all other claims that are so related to claims in [any civil action] within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). Under subpart (c)(3), a district court may decline to exercise supplemental jurisdiction over a claim under § 1367(a) if "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3).

Plaintiff does not put forth any arguments as to why her state law claims should remain in federal court if her § 1983 claims are dismissed. Since the Court is dismissing all of Bonvillain's § 1983 claims over which it has original jurisdiction, the Court invokes its authority under § 1367(c)(3) and declines to exercise its supplemental jurisdiction over any of the remaining state law claims. The Court is also aware of a pending state law action in which Bonvillain may be able to pursue her state law claims. R. Doc. 87-1 at 46 (referencing the pending state law wrongful death, survival, and spoliation action in the 32nd Judicial District Court for the Parish of Terrebonne). Notably, the Court cannot find another theory of recovery under § 1983 divorced from *Monell* that Plaintiff could pursue in federal court for an officer's negligence in fleeing from a scene, particularly when Plaintiff has stated that she is not pursuing any state law theories of

negligence for Leone's actions in federal court.

V.    **CONCLUSION**

For the foregoing reasons;

**IT IS HEREBY ORDERED** that Leone's Motion for Summary Judgment, R. Doc. 102, is **GRANTED**.

**IT IS FURTHER ORDERED** that Soignet and Guidry's Motion for Summary Judgment, R. Doc. 97, is **GRANTED**.

**IT IS FURTHER ORDERED** that TPCG Defendants' Motion for Summary Judgment, R. Doc. 87, is **GRANTED**.

New Orleans, Louisiana, this 24th day of June, 2025.

THE HONORABLE ELDON E. FALLON